We granted the petition for certiorari in this case because it is a case of first impression in several particulars. It is an adoption case. The Court of Civil Appeals affirmed the judgment of the probate court. We reverse and remand with directions.
The facts are not materially disputed. They do portray a picture of human tragedy and call for the Court to perform one of its most difficult and delicate functions.
In March of 1978, Pamela Sue Hanlon, who lived with her parents in Seymour, Indiana, became a rape victim at the age of seventeen. She learned for the first time in May of that year that the rape had resulted in pregnancy. She was informed of this fact by Dr. Maasen, an obstetrician-gynecologist. From the time Dr. Maasen learned of the circumstances resulting in Pamela's pregnancy, he counseled that it would be best for the child if she allowed its adoption. He told her that because the pregnancy resulted from a rape, she would more than likely beat and abuse the child. He repeated this opinion on each visit. Pamela's mother offered contrary advice, but testified that Pamela was finally persuaded by Dr. Maasen that she might harm the child if she kept it. He also told her that "If you get married, no boy is going to want to take that baby." Dr. Maasen told Pamela that he knew some people who would make a nice home for the baby.
The evidence shows that the people to whom Dr. Maasen referred were Mr. and Mrs. Joe Mooney, who live in Pelham, Alabama. Dr. Maasen met the Mooneys during his residency at the University of Alabama Medical School. Mr. Mooney runs a service station and apparently Dr. Maasen met him there. Joe Mooney is 43 years of age. His wife is 35. They have both been married previously. Mrs. Mooney has a teenaged son. Mr. Mooney is childless.
The Mooneys had sought to apply for adoption of a child with the Alabama Department of Pensions and Security (DPS), but their application was unacceptable under DPS regulations because that department does not accept applications from persons of the Mooneys' age.
In September, 1978, the Mooneys received a telephone call from one Fred DeMarco, who had been an assistant to Dr. Maasen and who was acquainted with the Mooneys. He advised that Dr. Maasen might have a child available for adoption. Mr. Mooney called his friend Dr. Maasen, who explained the situation with regard to Pamela, and was told "it might be a natural tie in and he would see if he could get it."
The Mooneys again contacted DPS to inquire as to the proper procedure for bringing *Page 561 
a child into the State of Alabama for adoption. They were informed of the proper method and were cited to § 38-7-15, Ala. Code 1975. They were also advised to seek an attorney's advice. The statute to which they were referred requires the consent of DPS prior to bringing a child into the state, and DPS may, as a condition precedent to bringing a child into the state, require an authorized agency in the state from which the child is brought to interview the natural parent or parents of the child. The Mooneys neither sought nor received the consent of DPS. Instead, a few days later they traveled to Seymour, Indiana, with "Consent to Adoption" forms prepared for Pamela's signature. Although the documents stated that she was acquainted with the Mooneys, all parties agree that this was untrue, and they had never met. They met Pamela's mother in Dr. Maasen's office, but did not see Pamela. The forms were signed by Pamela and her mother on October 28, 1978. They were subsequently notarized outside Pamela's presence. The Mooneys returned to Alabama with the consent forms.
Pamela gave birth to a baby girl on December 3, 1978, in Scaneck Hospital in Seymour, Indiana. She was discharged from the hospital six hours after the delivery and never saw the baby. Dr. Maasen immediately telephoned the Mooneys in Alabama to inform them of the birth of the baby. The Mooneys traveled to Indiana, and Dr. Maasen delivered the days old infant to them. The Mooneys returned to Alabama with the baby and on January 26, 1979, filed a petition for adoption of the child in the probate court of Shelby County. Meanwhile, Pamela kept asking Dr. Maasen about the baby and "kept on after him telling him [she] wanted [her] baby back." Maasen told her there was "not a snowball's chance in hell for [her] to have [her] baby." Pamela and her mother came to Shelby County and testified at a hearing held on March 7, 1979, on the Mooneys' petition to adopt the baby. Both Pamela and her mother filed in open court a revocation of their alleged consent to the adoption of the child.
On March 26, 1979, the probate judge, a non-lawyer, entered an interlocutory order which ordered the adoption proceedings to proceed according to law. This order was served on DPS so that that agency could conduct an investigation of the prospective adoptive parents as required by § 26-10-2, et seq., Ala. Code 1975. In its report to the court, DPS advised that although the Mooneys had been advised of the necessary procedure in bringing a child into the state for adoption, "said procedure was not followed and the child was brought into the state without prior approval of the State Department of Pensions and Security." The report also stated that "[s]ince October, 1978, the insecurities of adoptions where parents know the whereabouts of the child and where the mother is a minor have been repeatedly pointed out to the petitioners."
Pamela filed a petition for habeas corpus in the United States District Court for the Northern District of Alabama, which sought the return of her baby. This petition was dismissed for want of jurisdiction. She also filed a petition for writ of habeas corpus, or in the alternative, a petition for child custody, or in the alternative, a petition for declaratory judgment in the circuit court of Bartholomew County, Indiana. The Mooneys appeared in that proceeding, contested jurisdiction of the court and also the merits. The Indiana court granted the petition for writ of habeas corpus on January 22, 1980, and overruled the motion to dismiss for want of jurisdiction on February 7, 1980. At the request of the Mooneys, it continued the hearing on the merits to February 20, 1980, at which time the court entered the following judgment:
 This cause came on for Summary Hearing the 20th day of February, 1980, concerning the Writ of Habeas Corpus granted by this Court on the 22nd day of January, 1980, with respect to the alleged restraint by Respondents William Joe Mooney and Jean W. Mooney of one Julia Ann Hanlon (a/k/a Melana Susan Mooney), a child born December 3, 1978, in Jackson County, Indiana, to Petitioner Pamela Sue Hanlon Sullivan; *Page 562 
 Petitioner was present in person and by counsel, while Respondents were represented by counsel who appeared for the purpose of contesting the taking of jurisdiction of this cause by this Court and who objected to any consideration by the Court of the merits of Petitioner's claim;
 And the Court, being advised, and having elected to hear testimony of witnesses and to examine the exhibit presented and admitted into evidence, now finds as follows:
 1. This Court can and should consider the prayers of Petitioner for an award of custody of Julia Ann Hanlon to Petitioner and for a declaration of the invalidity of the purported Consent to Adoption executed by Petitioner on or about October 28, 1978, in addition to her prayer for delivery of the child to her, because of the seeming inseparability of those issues, one from another;
 2. Jurisdiction, having originally been taken for the purpose of addressing Petitioner's January 22, 1980 Petition for Writ of Habeas Corpus, has thus led this Court to consideration of the validity of the aforementioned October 28, 1978, Consent to Adoption, and if that purported consent is not invalid on its face by being executed before the birth of the child whose placement was sought, it certainly is based on the testimony of Petitioner concerning the reportedly extreme pressure placed on her by her attending physician during her pregnancy term to so consent, his promises that her consent could easily be revoked by her, her lack of opportunity to read the proposed consent in its entirety before executing it and the fact that the notarization of her signature was not even made in her presence; thus, this Court finds that the Consent should be set aside as invalid and void ab initio;
 3. And even if there was an ascription of validity possible respecting the aforementioned Consent to Adoption, the absence from this record of any involvement of any County Department of Public Welfare of this State or any duly licensed child-placing agency operating in this State should void an adoption wherever and by whomsoever granted;
 4. And this Court having found the consent void and invalid from the date of its execution and the entire adoption proceeding without and in disregard of applicable Indiana law, the domicile of the child with its mother, Petitioner herein, at said Petitioner's home in Columbus, Bartholomew County, Indiana, is an inescapable conclusion;
 IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:
 1. That Julia Ann Hanlon, born December 3, 1978, to Pamela Sue Hanlon Sullivan, Petitioner, herein, in Jackson County, Indiana, said child also known as Melana Susan Mooney, is being illegally restrained in Shelby County, Alabama, by Respondents William Joe Mooney and Jean W. Mooney and is to be forthwith returned to said Pamela Sue Hanlon Sullivan, who is currently domiciled at 2350 Illinois Street, Columbus, Bartholomew County, Indiana 47201;
 2. That Pamela Sue Hanlon Sullivan, be, and she hereby is declared to be, entitled to the care and custody of said Julia Ann Hanlon, as the natural mother of said child and whose parental rights have never been lawfully terminated by a Court of cognizant authority of this State and concerning which purported offer for adoption of such child no County Department of Public Welfare of this State or a licensed child-placing agency operating in this State has ever been involved;
 3. That the purported Consent to Adoption herein be and the same is hereby declared void ab initio.
 In the meantime, on February 14, 1980, the probate judge of Shelby County entered the final order of adoption granting the Mooneys custody of the child. Pamela, the natural mother, appealed.
Two ancient principles of law compel a reversal in this case. Adoption is purely statutory. It was unknown to the common law. The courts of this state have always required strict adherence to statutory *Page 563 
requirements in adoption proceedings. No case has stated this principle better than the Court of Civil Appeals in Davis v.Turner, 337 So.2d 355 (Ala.Civ.App. 1976), where it said:
 Adoption is strictly statutory, Hanks v. Hanks, 281 Ala. 92, 199 So.2d 169. Being unknown at common law, it cannot be achieved by contract, Prince v. Prince, 194 Ala. 455, 69 So. 906. Adoption is not merely an arrangement between the natural and adoptive parents, but is a status created by the state acting as parens patriae, the sovereign parent. Because the exercise of sovereign power involved in adoption curtails the fundamental parental rights of the natural parent, the adoption statutes must be closely adhered to.
337 So.2d at 360-361.
To give the consent signed by the mother the effect sought by the Mooneys would be to allow adoption by contract or to enforce an arrangement between these parties not sanctioned by either the law of Alabama or Indiana. Thus, it is immaterial whether we look to Alabama law or to the law of Indiana. The statutes of neither have been adhered to. It is not disputed that the requirements of § 38-7-15, Code 1975, were not complied with. The Court of Civil Appeals recognized this, but noted that noncompliance did not necessarily invalidate the proceedings. Under the facts of this case, we hold that it does. Indiana law, I.C. 31-3-1-6 (b), requires that "the consent to adoption may be executed at any time after the birth of the child either in the presence of the court, in the presence of a notary public or other persons authorized to take acknowledgements." It is not controverted that the consent here was signed several weeks before the birth of the child. Hence, Indiana's statutes were not complied with.
"[T]he courts of this state do not have the power to sever the bonds of blood relationship merely in order to gain some real or fancied advantage for a minor child." Griggs v. Barnes,262 Ala. 357, 78 So.2d 910 (1955). This statement recognizes the second ancient rule in this jurisdiction:
 The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for. . . .
 . . . So strong is the presumption, that "the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all"; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare, — that the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion to be disturbed, unless it plainly appears that the interests of the child require it to be set aside.
Striplin v. Ware, 36 Ala. 87, 89-90 (1860).
The same principle is again stated in Chandler v. Whatley,238 Ala. 206, 189 So. 751 (1939), by Justice Bouldin, speaking for the Court:
 The law, indulging the presumption that the welfare of this child will be best conserved by awarding her custody to her father, rather than the step-father, ordains that this shall be done, unless such presumption is overcome by clear and convincing evidence that the father is unsuited or unfit to assume the place of a father in providing a safe and comfortable home, proper environment, parental affection, care, training and education.
238 Ala. at 209, 189 So. 751.
The law recognizes that a higher authority ordains natural parenthood, and a fallible *Page 564 
judge should disturb the relationship thus established only where circumstances compel human intervention.
A reading of the record in this case convinces us that the probate judge did not observe this presumption, which under our law favors the natural parent. The entire record focuses on the relative affluence of the Mooneys as compared to that of the natural mother. The testimony establishes without a doubt that the Mooneys are more capable than the natural mother to assure financial security for this child. However, that is not the test. There is no evidence that the natural mother's limited ability to provide financial security for the child falls to the level which would authorize removing the child from her against her will. The record does indicate that the Mooneys have great love and affection for this baby girl. It likewise shows that her natural mother also loves her. The law favors the natural mother with a presumption which has not been overcome here. As Justice Mayfield said in Griggs v. Barnes, supra, which involved a suit between the mother of an illegitimate child and the foster parents to whom the mother had given the child immediately after its birth:
 We are mindful of the passionate and burning desire of couples who have been denied parenthood to give stability and meaning to their lives by the adoption of children. We also recognize that once a helpless babe is brought into a home, nurtured and cared for by its foster parents, that the tenderness and the depth of the bond between the infant and its benefactors increases with each passing day. We can say without hesitation that the attachment of these foster parents is now as deep as if this child were flesh of their flesh and blood of their blood.
 These natural and human feelings of the foster parents, however, cannot be allowed to sway us from our sworn and bounden duty to enforce the laws of this state. . . .
 While it is true that the "pole star" in custody cases is the best interest and welfare of the child, the courts of this state do not have the power to sever the bonds of blood relationship merely in order to gain some real or fancied advantage for a minor child.
. . . .
 This teen-aged mother, misguided though she was, carried this child, and gave of herself to complete her pregnancy. Alone, disgraced and afraid, she entered the twilight valley of the shadow of death to bring life to this child. Her right to this child is paramount. The natural parents, and in the case of illegitimate children, the natural mother, is entitled to the care and custody of her children, unless good cause is shown why the custody of the natural parent is not in the best interest of the child.
262 Ala. at 361-362, 78 So.2d 910.
Griggs did not involve a legal adoption. Neither does this case, since neither the law of Alabama nor that of Indiana was complied with. Had the law of either state been satisfied, or had the natural mother not asserted her right to custody of the child, we would view this case differently. However, all of the facts taken together convince us that as painful as it is, our oaths to uphold the law compel us to reverse the judgment of the Court of Civil Appeals and direct that this cause be remanded with directions to the probate court of Shelby County to deliver this infant to its natural mother, the petitioner here.
REVERSED AND REMANDED WITH DIRECTIONS.
All the Justices concur, except JONES, J., recused.
APPLICATION FOR REHEARING OVERRULED. OPINION CORRECTED. *Page 565